# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Springborn v. Village of Sugar Grove*, 2013 IL App (2d) 120861

---

| | |
|---|---|
| Appellate Court Caption | CHRISTOPHER SPRINGBORN, Plaintiff-Appellee, v. THE VILLAGE OF SUGAR GROVE, Defendant-Appellant (Brent Eichelberger, Individually and in His Official Capacity as Village Administrator, Defendant).–JOSEPH CECALA, Plaintiff-Appellee, v. THE VILLAGE OF CARPENTERSVILLE, Defendant-Appellant (Mark Rooney and Linda Morgren, Defendants). |
| District & No. | Second District <br> Docket Nos. 2-12-0861, 2-12-1072 cons. |
| Filed | September 25, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In consolidated appeals by defendant villages challenging the entry of summary judgments for two policemen on their claims for benefits under the Public Safety Employee Benefits Act for the injuries they suffered while removing obstructions from roadways, chunks of asphalt in one case and a felled signal pole in the other case, the appellate court affirmed the awards of benefits, since both officers reasonably believed they were facing an emergency when they came upon the obstructions, the situations were not foreseeable for purposes of section 10(b) of the Act, and their attempts to remove the obstructions manually were appropriate "responses." |
| Decision Under Review | Appeal from the Circuit Court of Kane County, Nos. 12-MR-73, 11-CH-3712; the Hon. Thomas E. Mueller, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Charles E. Hervas, Michael D. Bersani, and Zrinka Rukavina, all of Hervas, Condon & Bersani, P.C., of Itasca, for appellants Village of Sugar Grove and Brent Eichelberger.

James W. Fessler and James A. Rhodes, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Village of Carpentersville.

Craig S. Mielke, of Foote, Mielke, Shavz & O'Neil, of Geneva, and Ryan P. Theriault, of Foote, Meyers, Mielke & Flowers, LLC, of St. Charles, for appellees.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice McLaren concurred in the judgment and opinion.

## OPINION

¶ 1    In these consolidated appeals, the Village of Sugar Grove and the Village of Carpentersville challenge awards of benefits under section 10 of the Public Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2012)). For the following reasons, we affirm.

¶ 2                    I. BACKGROUND

¶ 3                 A. General Background

¶ 4    Plaintiffs, Christopher Springborn and Joseph Cecala, were police officers with, respectively, Sugar Grove and Carpentersville. In separate instances, they were injured while clearing roadway obstructions in the course of their duties. Plaintiffs petitioned their respective employers for insurance benefits under section 10 of the Act, which provides in relevant part:

"(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee ***.

* * *

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this

Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10(a), (b) (West 2012).

The municipalities declined the requests for benefits. Each plaintiff then brought a complaint in the trial court for a declaratory judgment that he was entitled to the benefits. Each alleged that he cleared the roadway obstructions in response to what he reasonably believed was an emergency. Springborn additionally alleged that his injury resulted from "an unlawful act perpetrated by another" (820 ILCS 320/10(b) (West 2012)). Cecala made no allegation of an unlawful act by another.

¶ 5        In both cases, the parties filed cross-motions for summary judgment. In the sections that follow, we recount the subsequent proceedings in each case.


¶ 6                        B. Background in No. 2-12-0861–Springborn

¶ 7        Attached to the parties' cross-motions for summary judgment were Springborn's discovery deposition and his testimony from two appearances before the Board of Trustees for the Police Pension Fund of Sugar Grove. From these sources we compile the following account, noting any significant disparities between the deposition testimony and the hearing testimony.

¶ 8        Springborn was on patrol on August 27, 2009, when, at 9:30 or 10 a.m., he received a dispatch that an off-duty police officer was attempting to stop a Meyer Paving truck on Route 47 between Bliss Road and Kedeka Road. Responding to the dispatch, Springborn proceeded north on Route 47. In the area of Route 47 and Kedeka Road, Springborn came across chunks of asphalt on Route 47. That section of Route 47 has two southbound lanes and two northbound lanes. The asphalt chunks covered the "whole [inside, or west, northbound] lane." There was a lesser quantity of chunks in the outside, or east, northbound lane. There were 10 to 15 chunks in all, each weighing "between 20 and 40 pounds." In his deposition testimony, Springborn stated that the chunks "ranged in size from about the size of a softball to about the size of–little bigger than a piece of paper, about three inches thick." In his hearing testimony, Springborn described the size of the chunks as "a foot and a half to two feet long by *** anywhere from three to six inches thick."

¶ 9        Springborn testified that Route 47 is "a major highway" in Kane County, with "heavy traffic," and that it was "rush hour" when he encountered the asphalt. The speed limit for that section of Route 47 was 45 or 55 miles per hour. Springborn stated that, upon spotting the asphalt, he asked the public works department in Sugar Grove for assistance in removing the asphalt. The department replied that the Illinois Department of Transportation had responsibility for clearing Route 47. Believing that the asphalt chunks presented an "emergency" and an "immediate safety hazard," Springborn activated his emergency lights and parked his squad car in the west northbound lane, where the majority of the asphalt chunks were located. He then removed the asphalt chunks by hand, tossing them onto the

-3-

shoulder or the median. Springborn believed that the police department's "police and procedure manual" required officers to remove roadway debris that might endanger motorists. Springborn suffered no injury or discomfort in removing these pieces of asphalt.

¶ 10    Springborn testified that, as he continued driving on Route 47, he encountered a second mass of asphalt chunks. In his deposition testimony, Springborn stated that the "numbers were about the same" as the first debris field but that "there were a few bigger pieces." In his hearing testimony, however, Springborn described the second debris field as "much larger" than the first debris field and opined that it presented an "even greater hazard" than the first because it was "actually protruding into both lanes." Most of the pieces, however, were in the west northbound lane. According to Springborn, the pieces in the second field "ranged in size from softball size to two to three feet [wide], anywhere from three to six inches thick." As with the first field, Springborn activated his emergency lights and parked behind the pieces in the west northbound lane. Observing that some of the chunks in the west lane were too large for him to lift, Springborn notified the dispatcher that he would need assistance. Springborn proceeded to clear the east lane without incident. While clearing the west lane, however, he slipped and injured his back. Springborn was alone at the scene when he was injured.

¶ 11    Springborn noted that the driver of the asphalt truck was charged with violating a state statute by spilling a load.

¶ 12    The trial court granted Springborn's summary judgment motion and denied Sugar Grove's motion. The court provided no rationale for its decision. Sugar Grove filed this timely appeal.

¶ 13                    C. Background in No. 2-12-1072–Cecala

¶ 14    The parties filed with their summary judgment motions the discovery deposition of Cecala and the affidavits of Scott Adams and Michael Kilbourne, both of whom were commanders in the Carpentersville police department on the evening that Cecala was injured.

¶ 15    Cecala testified that he was on patrol on December 29, 2008, when, at 9 p.m., he was dispatched to investigate a traffic accident and a possible case of driving under the influence at the intersection of Route 31 and Spruce Drive in Carpentersville. Cecala believed that the dispatcher might also have mentioned that a person was injured. Cecala considered the situation an "emergency" and headed to the scene with his emergency lights and siren activated. Cecala explained that, at their intersection, Route 31 runs north-south and Spruce east-west. The intersection is controlled in all four directions by traffic signals. Route 31 and Spruce each have two lanes for straight traffic. Additionally, southbound Route 31 has west and east turn lanes onto Spruce. The west southbound turn lane on Route 31, located at the northwest corner of the intersection, is separated from the straight lanes by a concrete triangle, on which, normally, a traffic signal stands. On this occasion, however, Cecala arrived to find the traffic signal felled and lying on Route 31. Cecala also observed a truck against a tree at the southeast corner of the intersection. Cecala surmised that the truck had struck the signal pole and proceeded to strike the tree. Cecala estimated that the signal pole was 10 to 15 feet long. The pole was lying across the entire west southbound straight lane

of Route 31. Cecala could not recall whether or how much the pole was protruding into Route 31's east southbound straight lane. Cecala did recall, however, that it was "still possible for vehicles traveling southbound on [Route] 31 to go through the intersection of Spruce." Cecala also noted that the east southbound turn lane on Route 31 would have aided vehicles in driving around the pole if indeed it was protruding into the east straight lane. When he arrived at the scene, Cecala was concerned not only because the pole posed a roadway obstacle, but also because its wires, which had been pulled out of the ground, were still live. Cecala described Route 31 as a "major thoroughfare" and a "pretty busy street all the time."

¶ 16     Cecala stated that he parked his squad car behind the signal pole in the west southbound straight lane of Route 31. His purpose was to position his squad car as a barrier between the pole and the southbound traffic. In addition to his squad car's emergency lights, Cecala activated its directional lights to signal traffic to veer left (or east). As in all situations involving roadway obstructions, Cecala's "most important" task upon arriving at the scene was to prevent motorists from hitting the obstruction. There were several other police officers present (Cecala could not recall the order in which he and the others arrived). Cecala "knew that the pole needed to be moved" and that it needed to be done "immediately." His squad car, though blocking the downed signal, was itself a "hazard" because "it's very dangerous for a police officer to be in the roadway even with the lights on." Cecala "kn[ew] that squad cars get rear-ended with their lights on," and he had seen "people get hit while squad cars are there." Cecala had "always [been] instructed to remove yourself from that situation as soon as you can[,] which would mean you would have to eliminate [the hazard]." Thus, even with his squad car blocking the pole, Cecala still deemed the situation an "emergency."

¶ 17     Cecala testified that, in his 12 years as a police officer, he had responded to two or three prior incidents involving downed traffic signals or telephone poles, and in each case police officers moved them manually. Cecala had also responded to "hundreds" of instances of other objects obstructing roadways, such as trees and dead deer. Cecala acknowledged that a pole need not be moved manually by a police officer. Cecala also noted that a tow truck had been called to the scene. While Cecala knew that a tow truck has the capacity to move a felled pole, he had never seen that done.

¶ 18     According to Cecala, he spoke with Sergeant O'Brien at the scene about "how we were going to get [the pole] off the roadway." He and O'Brien "were standing next to the pole discussing, 'We've got to move this pole.' " They then manually moved the pole and laid it across the concrete triangle from which it had fallen. Cecala estimated that the pole weighed 100 pounds. Once moved, the pole was no longer obstructing Route 31, but now one-third of it was protruding into Spruce Drive, and hence it was "still a problem." While O'Brien turned to other business at the scene, Cecala conferred with Officer Brown about the pole. They agreed that the pole needed to be moved again. Asked if there was "any emergency situation at that moment that required [them] to move the pole instead of waiting for somebody else to move it," Cecala answered:

"Other than the fact that it still presented a hazard in its location, there is nothing else that would prevent us from waiting for something, somebody else to come. Obviously[,] we

could have sat there and waited for someone else to come, but we chose to move it at that point."

¶ 19 Cecala and Brown decided to manually move the pole off the roadway and into a parking lot. As they made the effort, Cecala was injured. Cecala did not recall ever being ordered to move the pole. Cecala estimated that he was at the scene between 5 and 10 minutes altogether.

¶ 20 In his affidavit, Kilbourne stated that police department records reflected that two officers had already been at the scene for about five minutes when Cecala arrived.

¶ 21 In his affidavit, Adams averred that Route 31 was "one of the busiest thoroughfares that runs [*sic*] through the Village of Carpentersville." According to Adams, "the blockage of traffic of any type on Illinois Route 31 would require an emergency response on behalf of the [police department]." Adams noted:

"[T]he traffic signals at the intersection of Illinois Route 31 and Spruce Drive, while heavy, can be lifted and moved out of the roadway if they pose an obstruction, much as I did on numerous occasions while employed by the Village of Carpentersville Police Department.

\* \* \*

\*\*\* [I]f a downed traffic signal impeding traffic on Illinois Route 31 could not be quickly moved by [the police department], an officer would be assigned to provide emergency traffic direction, complete with a squad car with activated lights, until other village services could respond to the scene to place lighted barricades and traffic direction signage. The barricades and signage would remain in place until the traffic signal could be removed by State of Illinois personnel.

\*\*\* [W]hen providing emergency traffic direction for an extended period of time, vital resources are prevented from responding to other emergency situations.

\*\*\* [Cecala] \*\*\* was acting in accordance with law enforcement custom and practices with respect to his actions taken in regards to the downed traffic signal. [Cecala] was responding to the emergency needs of the Village of Carpentersville and its citizenry."

¶ 22 The trial court granted Cecala's motion for summary judgment and denied Carpentersville's motion. The court stated no rationale for its decision. Carpentersville filed this timely appeal.

¶ 23                               II. ANALYSIS

¶ 24 Summary judgment is appropriate only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). We review *de novo* the propriety of a trial court's grant of summary judgment. *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461 (2010). "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record."

*Pielet v. Pielet*, 2012 IL 112064, ¶ 28. "However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.* "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "The use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit." *Id.* "However, it is a drastic means of disposing of litigation and, therefore, should be allowed only when the right of the moving party is clear and free from doubt." *Id.*

¶ 25    Sections 10(a) and 10(b) of the Act impose two preconditions for the award of insurance benefits to a law enforcement officer. Section 10(a) provides that such benefits are available only where the officer "suffers a catastrophic injury or is killed in the line of duty." 820 ILCS 320/10(a) (West 2012). Section 10(b) further provides that "the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer['s] *** response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(b) (West 2012). Carpentersville and Sugar Grove do not dispute in these appeals that Springborn and Cecala suffered "catastrophic injuries." They dispute only that Springborn and Cecala met the requirements of section 10(b).

¶ 26    The most recent published decision on section 10(b) is *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, where the supreme court considered consolidated appeals of summary judgment rulings on claims for section 10 benefits brought by firefighters Michael Gaffney and Brian Lemmenes. In neither case was it questioned that the firefighter was catastrophically injured; the issue was whether the firefighter was injured "as a result of *** [his] response to what is reasonably believed to be an emergency" (820 ILCS 320/10(b) (West 2012)). The court held that, under the undisputed facts, the "emergency" component was met in Gaffney's case but not in Lemmenes'. *Gaffney*, 2012 IL 110012, ¶¶ 69-79.

¶ 27    To reach these conclusions, the court first had to ascertain section 10(b)'s definition of "emergency." The court noted this district's decision in *DeRose v. City of Highland Park*, 386 Ill. App. 3d 658, 661 (2008), where, resorting to dictionary definitions, we held that an "emergency" under section 10(b) means a situation that "is urgent and calls for immediate action." (Internal quotation marks omitted.) Reviewing primary and secondary definitions of "emergency" from Webster's Third New International Dictionary (1993), the court determined that our concept of "emergency" lacked the necessary component of unforeseeability. We quote the court's discussion at length because one of the definitional illustrations provided by Webster's, and relied upon by the court as elucidating the concept of foreseeability, is exactly the factual situation presented in both of the appeals at hand:

"The primary definition from Webster's Third New International Dictionary states an 'emergency' is 'an unforeseen combination of circumstances or the resulting state that calls for immediate action <they were far from help when the [emergency] overtook them>.' Webster's Third New International Dictionary 741 (1993). As our appellate court has held, an 'emergency' clearly requires an urgent and immediate response. The

-7-

definition also indicates, however, that the urgency or immediate action must result from an unforeseen circumstance. The requirement of an unforeseen event is shown by the illustration stating, 'they were far from help when the [emergency] overtook them.'

The other senses and illustrations also demonstrate that an unforeseen event is integral to an 'emergency.' Those senses and illustrations provide: 'a: a pressing need: EXIGENCY <a state of [emergency] existed during which any help was acceptable> b: a sudden bodily alteration such as is likely to require immediate medical attention (as a ruptured appendix or surgical shock) c: *a usu. distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen <an [emergency] water supply><[emergency] docking facilities><[emergency] crews working to clear the roads>.*' Webster's Third New International Dictionary 741 (1993). While we agree with the appellate court that an 'emergency' includes an element of urgency and the need for immediate action, we also believe it involves an unforeseen circumstance or event requiring that immediate action.

Further, section 10(b) covers situations arising in the performance of a public safety employee's job. The four factors from section 10(b) involve potentially dangerous situations occurring in the course of employment. A firefighter's employment includes responding to situations involving imminent danger to a person or property. The term 'emergency' in section 10(b), as applied to a firefighter, connotes the sense that either a person or property is in some form of imminent danger.

We, therefore, conclude that the plain and ordinary meaning of the term 'emergency' in section 10(b) is an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. To be entitled to continuing health coverage benefits under section 10(b), the injury must occur in response to what is reasonably believed to be an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." (Emphasis added.) *Gaffney*, 2012 IL 110012, ¶¶ 61-64.

Below, we return to the emphasized language. First, we recount the facts and reasoning in Gaffney's and Lemmenes' cases.

¶ 28 Gaffney was injured during a training exercise involving an actual fire on the third floor of a building. Gaffney wore full fire gear for the exercise, and his battalion chief instructed him to treat the exercise as an actual emergency. As the crew was moving the fire hose between the second and third floors, it became stuck. Due to smoke, there was no visibility. Gaffney followed the hose back down to the second floor and discovered that it was hooked around a chair. In moving the chair, Gaffney injured his shoulder. *Id.* ¶¶ 6-8.

¶ 29 The supreme court held that Gaffney's training exercise became an emergency when there arose the unforeseen event of the hose becoming stuck. *Id.* ¶ 66. This event created imminent danger and required an urgent response, as "the crew was stranded on the stairwell to the third floor of the burning building with no visibility and no water to put out the fire." *Id.* Moreover, when Gaffney went to free the hose, he "put himself at risk of becoming lost and disoriented in the smoke-filled building." *Id.* ¶ 67. The court noted that Gaffney had no

"option of ending his participation in the exercise after it became an emergency." *Id.*

¶ 30     In Lemmenes' case, he, too, was injured during a training exercise. The exercise took place at an abandoned factory. The firefighters were required to wear full fire gear. There was no actual fire, but the firefighters' masks were blackened in order to simulate live fire conditions, and they were told to act as if there was an emergency. The firefighters were instructed that a fellow firefighter was trapped inside the building, was running out of air, and would die if not found and rescued. The firefighters were given specific instructions for the exercise, including a predetermined path for running the fire hose into the building. Fire department supervisors testified that the individual acting as the trapped firefighter was never in real danger during the exercise, which was performed under " 'controlled conditions.' " *Id.* ¶¶ 21-24.

¶ 31     Lemmenes was injured when he attempted to free the trapped firefighter. *Id.* ¶ 22. The court held that Lemmenes could not have reasonably believed that he was responding to an "emergency" under section 10(b). The court noted that the exercise was conducted under " 'controlled conditions,' " no one was in imminent danger at any point during the exercise, and "[n]o unexpected or unforeseen developments arose during th[e] drill, unlike the situation in *Gaffney* where the hose line became entangled in an unknown object." *Id.* ¶ 77.

¶ 32     We note that, though *Gaffney* modified *DeRose*'s definition of what is objectively an emergency, *Gaffney* did not abrogate *DeRose*'s holding that section 10(b) requires the claimant to have subjectively believed that he was facing an emergency. See *DeRose*, 386 Ill. App. 3d at 661 (section 10(b) requires a determination "(1) whether [the claimant] believed that he was facing an emergency and (2) whether that belief was reasonable").

¶ 33     Applying section 10(b) as construed in *Gaffney*, we note that the affidavits, depositions, and hearing testimony submitted by the parties do not disclose any issue of material fact in either case before us. The parties draw conflicting inferences from those facts, but on the material points the only reasonable inferences are drawn by Springborn and Cecala. That is, the undisputed facts in each case show that (1) the officer believed that he was responding to an emergency; and (2) his belief was reasonable.

¶ 34     First, both officers actually believed that they were facing emergencies. Each characterized the road obstruction as a "hazard" or an "emergency." Cecala also believed that his squad car, stopped in a lane of traffic, was itself a hazard justified only by the pressing need to block traffic from the signal pole.

¶ 35     Carpentersville, however, contends that, if Cecala believed that the signal pole needed to be moved immediately, he would not have taken time to speak, first with O'Brien and then with Brown, about moving the pole. Rather, Cecala "would have immediately moved [the pole]." This point lacks merit. First, the apparent reason Cecala conferred with a colleague in both instances was that he needed help lifting the pole. Second, the evidence suggests that the conferments about the pole were not casual and meandering, but focused on the obvious logistical problem of moving the unwieldy pole.

¶ 36     The record further establishes that Springborn's and Cecala's subjective beliefs about the presence of an emergency were reasonable. Carpentersville disputes that the felled traffic signal was an unforeseen circumstance given Cecala's and Adams' statements of prior

experiences with roadway obstructions such as traffic signals, light poles, trees, and dead deer. Carpentersville, however, overlooks a particular sense of foreseeability that the supreme court in *Gaffney* noted was expressed in dictionary definitions of "emergency." An "emergency" includes " 'a usu. distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen <an [emergency] water supply><[emergency] docking facilities><*[emergency] crews working to clear the roads*>.' " (Emphasis added.) *Gaffney*, 2012 IL 110012, ¶ 62 (quoting Webster's Third New International Dictionary 741 (1993)). Thus, an event is no less dire if it falls within the kinds of events that police officers ought to anticipate encountering in their daily duties. Coincidentally, the dictionary entry that the supreme court quoted as illustrative of the nuances of foreseeability cites the example of roadway obstructions as a type of emergency. We do not suggest that any roadway debris is *per se* an emergency under section 10(b); each case must be decided on its own facts. We are simply rejecting the suggestion that past police experience with a certain kind of event renders a particular instance of such an event foreseeable for purposes of section 10(b). Here, as explained below, the roadway obstructions "involv[ed] imminent danger to a person or property requiring an urgent response" (*id.* ¶ 64). The additional requirement of foreseeability was satisfied because the particular circumstances of the events were not foreseeable, even as much as the police were prepared by their training and experience to address those types of events.

¶ 37    Carpentersville and Sugar Grove each argue that there was no "imminent danger" because the squad car blocked the roadway obstruction and there was an open lane through which traffic could pass. Here we note that Carpentersville questions not the need to move the pole once it was protruding into Spruce Drive, but the need to move it in the first instance, after Cecala had parked behind it. Cecala testified that, in his experience, a squad car stopped on a roadway, while a necessary immediate precaution, poses its own "hazard" and, therefore, the roadway obstruction should be quickly removed. Adams averred that it is the policy of the Carpentersville police that roadway obstructions should be "quickly moved" by officers. Adams explained that the provision of emergency traffic direction "for an extended period of time" consumes "vital resources." There were no similar representations in Springborn's case, but the safety factor applies there as well. The record suggests that Route 47, like Route 31, is a major, heavily trafficked roadway. Parking a squad car on either road would present danger, most obviously from inattentive drivers.

¶ 38    Carpentersville and Sugar Grove also question whether attempted manual removal of the obstructions was appropriate. We note that, in each case, manual removal was the most readily available means and so the most suited to the pressing need to clear the roadway of both the obstruction and the squad car. In Cecala's case, Adams confirmed in his affidavit that manually removing a signal pole from the roadway is within the physical capacity of a police officer, and Adams implied that manual removal ought to be tried before assistance is summoned.

¶ 39    Carpentersville claims that there was circumstantial evidence of the lack of imminent danger in the fact that the officers who preceded Cecala to the scene "did not immediately move the downed traffic signal." The record is silent, however, as to what these officers were

doing before Cecala arrived. They might well have attempted, unsuccessfully, to move the signal pole. Or, perhaps they devoted their attention to the driver who crashed.

¶ 40    Carpentersville also finds it telling that (in its words) "[Cecala] conceded that he could have waited for someone or something to move the downed traffic signal, but he decided not to wait." Carpentersville fails to acknowledge the entirety of Cecala's statement, which was:

> "*Other than the fact that it [the signal pole] still presented a hazard in its location*, there is nothing else that would prevent us from waiting for something, somebody else to come. Obviously[,] we could have sat there and waited for someone else to come, but we chose to move it at that point." (Emphasis added.)

Cecala's concession was simply that it would have been possible (in a loose sense) to wait for assistance. Cecala did not concede that waiting would have been appropriate given the hazards of the situation.

¶ 41    Sugar Grove contends that, because Springborn had already determined that the second field of asphalt contained pieces that he could not lift without assistance, and indeed told dispatch as much, he simply could have waited for assistance before clearing any of the asphalt. By clearing what he could, however, Springborn reasonably attempted to shorten the time that the hazards would be on the roadway.

¶ 42    For the foregoing reasons, we conclude that, under the undisputed facts, Springborn and Cecala each reasonably believed that he faced an emergency.

¶ 43    Carpentersville makes the further contention that Cecala's injury was not sustained in "response to *** an emergency" (820 ILCS 320/10(b) (West 2012)) because, at the moment he attempted to move the signal pole, he "was not reacting or responding to anything," either "a call for help" or "an order to move the traffic control signal." This reading of section 10(b) finds no support in *Gaffney*. Cecala's decision to move the signal pole was no less a "response" under section 10(b) than was Gaffney's decision to free the fire hose by moving the chair. Cecala's "response" was initiated when he complied with the dispatch, and that "response" was ongoing when he opted to move the traffic signal pole.

¶ 44    Lastly, Carpentersville urges us to consider the financial impact an affirmance would have on municipalities going forward. This is not a proper factor for our decision. We apply section 10(b) as interpreted by *Gaffney*, come what may.

¶ 45    We note that Springborn's complaint sought section 10 benefits on the additional ground that he was injured "as the result of *** an unlawful act perpetrated by another" (820 ILCS 320/10 (West 2012)). (Cecala alleged no such additional ground.) On appeal, Sugar Grove disputes that Springborn met this ground. Since our holding under the "emergency" prong of section 10(b) is adequate to sustain the trial court's summary judgment ruling, we need not address whether Springborn met this additional ground under section 10(b).

¶ 46    For the foregoing reasons, we affirm the judgments of the circuit court of Kane County.

¶ 47    Affirmed.