2025 IL App (1st) 231952-U

No. 1-23-1952

Order filed February 20, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| CHARLES R. FORD, | ) | |
| | ) | |
|    Plaintiff-Appellee, | ) | |
| | ) | |
|   v. | ) | Appeal from the |
| | ) | Circuit Court of |
| VILLAGE OF NORTHBROOK, THE MEMBERS OF | ) | Cook County. |
| THE VILLAGE BOARD OF TRUSTEES OF THE | ) | |
| VILLAGE OF NORTHBROOK, RICH NAHRSTADT, | ) | No. 21CH04930 |
| VILLAGE MANAGER, and JUDY BUTCH, | ) | |
| EXECUTIVE ASSISTANT TO VILLAGE MANAGER, | ) | Honorable |
| | ) | Eve M. Reilly, |
|    Defendants. | ) | Judge Presiding. |
| | ) | |
| (Village of Northbrook, | ) | |
| | ) | |
|    Appellant). | ) | |

JUSTICE LYLE delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the judgment of the circuit court reversing the decision of the Village of Northbrook to deny health insurance benefits to Charles Ford where the Village of Northbrook's decision was clearly erroneous.

¶ 2    Plaintiff Charles R. Ford was employed as a firefighter/paramedic for the Village of Northbrook. Mr. Ford suffered a catastrophic injury while transferring a patient to the hospital after responding to an emergency call. Mr. Ford applied for, and was granted, line-of-duty disability pension benefits by the Board of Trustees of the Northbrook Firefighters Pension Fund (Pension Fund). Mr. Ford then applied for health insurance benefits through the Village of Northbrook under the Public Safety Employee Benefits Act (the Act) (820 ILCS 320/1 *et seq.* (West 2022)). The Board of Trustees of the Village of Northbrook (the Village) denied Mr. Ford's application for health insurance benefits, finding that Mr. Ford was not injured as the result of responding to what he reasonably believed was an emergency.

¶ 3    Mr. Ford sought judicial review of the Village's decision in the circuit court of Cook County. The circuit court reversed the decision of the Village, finding that its determination that Mr. Ford was not responding to what he reasonably believed was an emergency at the time he was injured was clearly erroneous. The Village now appeals, contending that its decision that Mr. Ford was not responding to an emergency at the time he was injured was not against the manifest weight of the evidence. The Village maintains that even if Mr. Ford was initially responding to an emergency, any emergency had ceased by the time Mr. Ford was injured while transferring the patient to the hospital. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                                    I. BACKGROUND

¶ 5    Mr. Ford was hired by the Village of Northbrook Fire Department in May 1997. On June 19, 2017, Mr. Ford was working as an ambulance officer when he was dispatched to the home of a "person feeling weak." Mr. Ford testified that the call was considered "non-fire emergent." When Mr. Ford arrived at the patient's home with four other paramedics, the 325-pound, 65-year-old patient was sitting on the toilet with two family members holding her upright. According to Mr.

Ford's patient care report, the patient had become too weak to stand after taking her evening medications. The patient's skin appeared pale, she was on numerous medications, and she had a history of high blood pressure and high cholesterol. The patient also had pain in her lower back and weakness in her extremities. Mr. Ford's patient history noted that the patient had a tumor on her spine.

¶ 6     The paramedics used a stair chair to move the patient from the bathroom onto an ambulance cot in the living room. The patient stated that she was in "a lot" of pain but declined pain medication. Mr. Ford and his partner transported the patient to the hospital with emergency lights and sirens activated. On the way to the hospital, Mr. Ford provided the patient with oxygen and "basic life support." Mr. Ford testified that he used this course of treatment because there was "[n]othing urgent" and no "severe-pending medical issues." The purpose of the basic life support was to monitor the patient and keep her comfortable while she was transported to the hospital. The patient's vitals were "good" and she was alert and oriented "times four." Mr. Ford and his partner transported the patient to the Glenbrook Emergency Room.

¶ 7     When they arrived at the hospital, hospital personnel helped Mr. Ford and his partner transfer the patient from the ambulance cot to the emergency room bed. While lifting the patient to make the transfer, Mr. Ford felt a burning sensation and a "kind of pop/give" in his right shoulder area. Mr. Ford also noticed a "tingling" sensation that started at his elbow and went down through his fingers. Mr. Ford gave a patient report to the emergency room staff, then returned to headquarters. He informed his supervisors about his injury and was sent to the emergency room to be evaluated. Mr. Ford was evaluated and told that he had a strain from overexertion and that the muscle may be causing some neurological issues. Mr. Ford filed an injury report and indicated on

the form that the call where he was injured was an Emergency "EMS" call. Mr. Ford's supervisor approved the form.

¶ 8    Mr. Ford was still experiencing these symptoms two days later and visited an orthopedic specialist. The doctor conducted a physical examination and took x-rays of Mr. Ford's neck and shoulders. The shoulder showed no fracture or dislocation, but Mr. Ford had a narrowing of his cervical spine in certain areas. An MRI also showed a narrowing of Mr. Ford's cervical spine.

¶ 9    Mr. Ford sought line-of-duty disability pension benefits from the Pension Board pursuant to section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2020)). At the hearing, Mr. Ford testified that he was unable to perform physically strenuous work for prolonged periods due to his shoulder injury. Following the hearing, the Pension Board granted Mr. Ford line-of-duty disability pension benefits.

¶ 10    Mr. Ford next applied to the Village for payment of his health insurance premiums under the Act (820 ILCS 320/10 (West 2020)). To qualify for benefits under the Act, Mr. Ford was required to establish eligibility under both sections 10(a) and (b). Those sections provide, in relevant part:

> (a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support ****.

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible. 820 ILCS 320/10(a), (b) (West 2020).

¶ 11 In support of the application, Mr. Ford submitted the evidence and testimony he presented to the Pension Board. As part of his application to the Pension Board, Mr. Ford attached reports from the Regional Emergency Dispatch Center (RED Center). The RED Center determines the appropriate response to 911 calls in the Village and alerts the Northbrook Fire Department what type of response is necessary based on the call. In this case, the report generated by the RED Center showed that the 911 call was for a 65-year-old patient who could not walk and took medications. The RED Center assigned the call a response code of "1 Emergency," dispatching both an ambulance and a fire truck.

¶ 12 In reviewing Mr. Ford's application for benefits, the Village noted that there was a two-part analysis to determine if a public safety officer is entitled to benefits under the Act. First, the public safety officer must be catastrophically injured under section 10(a); and second, the injury must occur during what the officer reasonably believed to be an emergency under section 10(b). The Village observed that a public safety officer will be considered catastrophically injured under section 10(a) where the officer has been awarded line-of-duty disability benefits. The Village found that Mr. Ford had therefore satisfied that section.

¶ 13    The Village determined, however, that Mr. Ford was not injured during the course of what he reasonably believed to be an emergency. The Village highlighted Mr. Ford's testimony before the Pension Board that he provided only basic life support to the patient and there was no "urgent or severe-pending medical issue." The Village acknowledged that Mr. Ford did not have be injured during a "heroic act" in order for the injury to have occurred during an emergency, but determined that "there simply is no record establishing that there was any seen or unforeseen circumstances involving imminent danger to any person or property involved." The Village found that although Mr. Ford may have initially responded to an emergency call, the circumstances changed when he arrived on the scene and discovered there were no emergent circumstances. In addition, when Mr. Ford arrived at the hospital, the Village found that there was no evidence to support that lifting and transferring the patient had to be conducted in an emergent or hurried manner. The Village therefore denied Mr. Ford's application for benefits under the Act.

¶ 14    Mr. Ford filed a multi-count complaint in the circuit court of Cook County, seeking a reversal of the Village's decision. After the other counts were struck, Mr. Ford proceeded on a common law writ of *certiorari* to obtain judicial review of the Village's decision. In support thereof, Mr. Ford contended that the Village erred in finding that he was not injured while responding to what he reasonably believed to be an emergency.

¶ 15    The circuit court granted Mr. Ford's writ of *certiorari*, finding that the Village's determination that Mr. Ford was not injured while responding to what he reasonably believed to be an emergency was clearly erroneous. The court observed that the medical records showed that the patient presented with pale skin, was on numerous medications, was complaining of pain, and was given oxygen in the ambulance. The court noted at the time Mr. Ford was injured while transferring the patient, he did not have a diagnosis for the patient, did not know the cause of her

pain, and could not have known if the emergency had passed. The court determined that it was reasonable for Mr. Ford to believe that the emergency was ongoing. The court therefore reversed the decision of the Village and instructed the Village to provide Mr. Ford health insurance benefits under the Act.

¶ 16    The Village filed a timely notice of appeal from the circuit court's order. We find that we have jurisdiction to consider the merits of the appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 17                                    II. ANALYSIS

¶ 18    On appeal, the Village contends that the circuit court erred in reversing its decision to deny Mr. Ford benefits under the Act where the record demonstrated that he was not injured during the course of what could objectively be considered an emergency. The Village maintains that Mr. Ford's testimony showed that there was no emergency when he arrived at the patient's house and no unforeseen circumstances or imminent danger arose during the call or while transferring the patient to the hospital. The Village asserts that Mr. Ford's subjective belief that he was responding to an emergency when he was injured was not reasonable and is insufficient to satisfy the standard of section 10(b).

¶ 19                            A. Standard of Review

¶ 20    After the other counts in Mr. Ford's complaint were dismissed, his complaint seeking review of the Village's decision stated a claim for common law writ of *certiorari*. "A common-law writ of *certiorari* is the general method for obtaining circuit court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)) and the act provides for no other form of review." *Fillmore v. Taylor*, 2019 IL 122626, ¶ 67 (citing *Hanrahan v. Williams*, 174 Ill. 2d 268,

272 (1996)). The standards of review under a common law writ of *certiorari* are essentially the same as those under the Administrative Review Law. *Hanrahan*, 174 Ill. 2d at 272.

¶ 21     As such, we review the final decision of the Village, not the circuit court, and our standard of review depends on the question presented. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 48. If the question presented is one of fact, we will not reverse the findings of the administrative agency unless its determination is against the manifest weight of the evidence. *Cinkus v. Village of Stickney Municipal Officers Electoral Bd.*, 228 Ill. 2d 200, 210 (2008). Where the historical facts are admitted or established, the rule of law is undisputed, and the only question is whether the rule of law as applied to the established facts is or is not violated, this presents a mixed question of fact and law, and we will reverse the administrative agency's decision only if it is deemed clearly erroneous. *Id.* at 211. Finally, where the issue presented is solely a question of law, our review is *de novo*. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 22     The Village maintains that we should apply the manifest weight standard of review in this case because the question presented is whether Mr. Ford is entitled to benefits pursuant to the Act under the facts of the case. Mr. Ford asserts that we should review the Village's final decision *de novo* because the facts are not in dispute and the only question is whether Mr. Ford was entitled to benefits under the Act.

¶ 23     In this case, the question presented is whether Mr. Ford was injured during the course of what he "reasonably believed to be an emergency" as that phrase is used in section 10(b). The historical facts are not in dispute and, as discussed below, neither is the rule of law. The only question is whether the established facts satisfy the legal standard. Therefore, we must examine the legal effect of a given set of facts, which is a mixed question of fact and law. *Beggs*, 2016 IL

120236, ¶ 50. Accordingly, we will reverse the Village's decision only if we find that it is clearly erroneous. We will find the that the Village's decision is clearly erroneous only if, after reviewing the entire record, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 24                          B. Benefits under Section 10 of the Act

¶ 25    As noted, to be entitled to benefits under the Act, a public safety officer must satisfy both sections 10(a) and 10(b) of the Act. The parties do not dispute that Mr. Ford satisfied the requirements of section 10(a) by establishing that he suffered a catastrophic injury. Our supreme court has held that the phrase "catastrophic injury" in that section is synonymous with an injury resulting in a line-of-duty disability under section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2016)). *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 394 (2003). Here, the Pension Board awarded Mr. Ford line-of-duty disability benefits under the Pension Code as a result of his injury. Thus, there is no dispute that he suffered a "catastrophic injury" within the meaning of section 10(a) of the Act. *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 54. Therefore, the only point of contention in this case is whether Mr. Ford satisfied the requirements of section 10(b). Specifically, the issue is whether the facts alleged by Mr. Ford show that his injury occurred as a result of his "response to what is reasonably believed to be an emergency," within the meaning that section. *Id.*

¶ 26                 C. Unforeseen Circumstance Involving Imminent Danger

¶ 27    The Village asserts that Mr. Ford was not injured during what is reasonably believed to be an emergency because there were no unforeseen circumstances involving imminent danger to the patient or any property at the time of his injury. The Village derives this definition of "emergency"

from our supreme court's decision in *Gaffney*. In *Gaffney*, our supreme court stated that "the plain and ordinary meaning of the term 'emergency' in section 10(b) [as applied to a firefighter] is an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Id.* ¶ 64. The two firefighter plaintiffs in *Gaffney* were injured during training exercises. *Id.* ¶¶ 9, 21. With regard to plaintiff Michael Gaffney, the supreme court determined that he was injured as the result of an emergency because, during the training exercise, the firehose became entangled causing him to backtrack toward the obstruction with "no visibility and the risk of becoming disoriented in the smoke-filled building." *Id.* ¶ 65. The court determined that this entanglement of the hose was an unforeseen circumstance that required an urgent response and turned the training exercise into an emergency due to the presence of live fire and smoke, even in a training setting. *Id.* ¶¶ 65-66.

¶ 28    The court determined that the other plaintiff in *Gaffney*, Brian Lemmenes, was not injured as the result of an emergency because no unforeseen circumstances arose during the training exercise where he was injured. *Id.* ¶ 77. Lemmenes wore a "blacked out" mask to simulate an actual fire, but, unlike Gaffney's training exercise, there was no live fire or smoke. *Id.* ¶ 74. Lemmenes injured his knee while trying to free an individual from an unknown obstacle. *Id.* ¶ 76. The court noted that although the firefighters were instructed to treat the training exercise as though it was a real emergency, there was no live fire and no smoke, and the firefighters could exit the training by removing their blackout masks. *Id.* ¶¶ 77-78. The court found that the training exercise was conducted under planned, " 'controlled conditions,' " and no unexpected or unforeseen developments arose during the drill, unlike when Gaffney's fire hose became entangled on an unknown object. *Id.* ¶ 77.

¶ 29 This court had an opportunity to examine *Gaffney* in *Springborn v. Village of Sugar Grove*, 2013 IL App (2d) 120861. *Springborn* involved two police officers who were injured, in separate incidents, while clearing roadway obstructions in the course of their duties. *Id.* ¶ 4. Plaintiff Christopher Springborn was responding to call where an off-duty police officer was attempting to stop a paving truck. *Id.* ¶ 8. On his way to provide assistance, Springborn encountered large chunks of asphalt that had fallen from the truck blocking the roadway. *Id.* Believing that the asphalt chunks presented an emergency, Springborn activated his emergency lights and parked his squad car on the roadway. *Id.* While clearing the asphalt chunks from the roadway, Springborn slipped and injured his back. *Id.* ¶ 10.

¶ 30 Plaintiff Joseph Cecala was dispatched to investigate a traffic accident. *Id.* ¶ 15. Cecala believed that the dispatcher might have mentioned that a person was injured. *Id.* Cecala considered the situation an emergency and headed to the scene with his emergency lights activated. *Id.* When he arrived, he observed that the signal pole for the traffic light at the intersection had been felled and was lying across the street. *Id.* Cecala was injured while manually moving the pole off the roadway. *Id.* ¶ 19. In both officers' cases, their respective villages denied them benefits under the Act, and each sought judicial review of those decisions in the circuit court. *Id.* ¶¶ 4, 12, 22. The circuit court granted summary judgment in favor of the officers and the municipalities appealed. *Id.* ¶¶ 12, 22.

¶ 31 The appellate court found that, under these undisputed facts, both officers were injured as a result of what they reasonably believed to be an emergency under the Act. *Id.* ¶ 42. The court noted that both officers subjectively believed that they were facing an emergency, and the court found those subjective beliefs were reasonable. *Id.* ¶ 36. One of the defendant municipalities argued that Cecala was not faced with an emergency because the downed traffic light was not an

unforeseen circumstance given the officer's experience with roadway obstructions. *Id.* The court rejected this argument, however, finding that it "overlook[ed] a particular sense of foreseeability that the supreme court in *Gaffney* noted was expressed in the dictionary definitions of 'emergency.' " *Id.* Relying on *Gaffney*, the court stated that an "emergency" includes a "distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen." (Internal quotation marks omitted.) *Id.* (quoting *Gaffney*, 2012 IL 110012, ¶ 62).

> "We do not suggest that any roadway debris is *per se* an emergency under section 10(b); each case must be decided on its own facts. We are simply rejecting the suggestion that past police experience with a certain kind of event renders a particular instance of such an event foreseeable for purposes of section 10(b). Here, as explained below, the roadway obstructions 'involv[ed] imminent danger to a person or property requiring an urgent response' [citation]. The additional requirement of foreseeability was satisfied because the particular circumstances of the events were not foreseeable, even as much as the police were prepared by their training and experience to address those types of events." *Id.*

¶ 32    We agree with the reasoning in *Springborn*, and, applying the standard in *Gaffney* to the undisputed facts of this case, we find that the Village erred in holding that Mr. Ford was not entitled to benefits under section 10 of the Act. Mr. Ford was injured while responding to an emergency call that was assigned priority 1 by the RED Center. Although that determination does not control whether an emergency existed, the designation speaks to the reasonableness of Mr. Ford's subjective belief that he was responding to an emergency. See *id.* ¶¶ 32, 36. When Mr. Ford arrived on the scene, he observed the patient was too weak to stand and was being supported in a sitting position by two other people. The patient also presented with pale skin, was on numerous medications, and was complaining of pain, but refused pain medications. In the ambulance, the

patient was given oxygen and Mr. Ford monitored her vital signs. Mr. Ford was then injured while transferring the patient from the ambulance cot to the emergency room staff. Throughout the call, and at the time of the transfer, Mr. Ford did not know what had caused the patient's weakness or pain and did not have a diagnosis for the patient. It was therefore reasonable for Mr. Ford to believe that he was faced with an emergency.

¶ 33    Even as much as Mr. Ford was prepared by his training and experience, the particular circumstances of this event were not foreseeable. *Springborn*, 2013 IL App (2d) 120861, ¶ 36. The event is no less dire if it falls within the kinds of events that a firefighter/paramedic ought to anticipate encountering in their daily duties. *Id.* The patient's condition was such that Mr. Ford believed there was imminent danger to the patient that required the urgent response of transporting the patient to the emergency room and transferring her to hospital staff. Based on the facts presented, we find that Mr. Ford's subjective belief was reasonable.

¶ 34    The Village asserts, however, that even if Mr. Ford believed that he was responding to an emergency based on the information provided by dispatch, the circumstances he discovered when he arrived on the scene established that no emergency existed. The Village maintains that the circumstances in this case are similar to those presented in *Wilczak v. Village of Lombard*, 2016 IL App (2d) 160205. In *Wilczak*, the plaintiff firefighter injured his shoulder while lifting a disabled citizen from the floor onto the bed. *Id.* ¶ 3. The plaintiff testified that the citizen, who suffered from multiple sclerosis, was stuck between his bed and a wall and could not get up. *Id.* ¶¶ 3, 6. After assessing the citizen, the plaintiff and his partner determined that it was safe to move the citizen from the floor and into his bed. *Id.* ¶ 6. As they were lifting him, the citizen became caught on the side of the bed and the plaintiff his partner " 'kind of lunged and swung him onto the bed.' " *Id.* The plaintiff injured his shoulder during this "lunging" motion. *Id.* The plaintiff

testified that he considered the "invalid assist" call to be an emergency because it was a 911 call. *Id.* The plaintiff's partner testified that he had been dispatched the citizen's residence several times and each of the calls were for an invalid assist where they had to lift the citizen off the floor and place him in his bed or wheelchair. *Id.* ¶ 8. The DuPage Public Safety Communications (DuComm) dispatch center, which dispatched the plaintiff and his partner to the citizen's residence classified the call as a "priority 2," which meant that it was not life threatening. *Id.* ¶¶ 7, 9. The dispatcher provided the following information: " 'invalid assist, needs help into bed—has MS." *Id.* ¶ 9.

¶ 35   The Village of Lombard denied the plaintiff's request for benefits under the Act and the circuit court affirmed, finding that although the situation involved a 911 call, no person would reasonably believe that there was an emergency. *Id.* ¶¶ 4, 11.

¶ 36   On appeal, this court noted that the plaintiff was familiar with DuComm's protocols and therefore knew before he arrived at the residence that the citizen was not sick or injured and needed assistance only to move from one place to another. *Id.* ¶ 17. The court determined that the plaintiff "should have been aware from the beginning that the call did not involve an emergency." *Id.* The court observed that although the plaintiff was required to respond to the call as if it were an emergency—by activating the fire engine's lights and sirens—this did not establish that there was an emergency within the meaning of section 10(b) of the Act. *Id.* ¶ 18. The court also found that the plaintiff's subjective belief that he weas responding to an emergency was insufficient to satisfy the standard under that section. *Id.* The court acknowledged that the plaintiff did not know what he would find when he arrived at the citizen's residence, but determined that what he learned when he arrived confirmed that there was no emergency. *Id.*

¶ 37   The court rejected the plaintiff's assertion that it was an emergency because he did not have the option of waiting for someone else to move the patient. *Id.* ¶ 19. The court observed that there

was no support for this assertion in the record and the plaintiff's partner testified that they could have called for help to move the citizen. *Id.* The court concluded that the citizen was not in imminent danger, no unforeseen circumstances arose during the response, and the move did not require an urgent response. *Id.* ¶¶ 18-19. The court therefore found that the plaintiff was not injured during what he reasonably believed was an emergency. *Id.* ¶ 24.

¶ 38    The Village asserts that, like in *Wilzcak*, the facts presented in this case show that from the time Mr. Ford responded to the call until the time he was injured, there were no unforeseen circumstances that involved imminent danger to the patient or Mr. Ford. The Village notes that Mr. Ford provided only basic life support to the patient, he testified that there were no severe-pending or emergent medical issues, and he simply monitored the patient's vitals during the ambulance ride to the hospital.

¶ 39    We find the circumstances in *Wilzcak* distinguishable from the case at bar. First, we observe that DuComm classified the call as priority 2 in that there were no life-threatening circumstances involved. In this case, as discussed, the RED Center designated the call Mr. Ford responded to as a "priority 1" emergency. Although the dispatch center's designation of the call is not determinative of whether an emergency exists (see *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 42), it is relevant in establishing whether Mr. Ford's subjective belief that he was responding to an emergency was reasonable. In addition, the patient in *Wilzcak* needed assistance only getting from the floor onto the bed. This was reflected in the information from DuComm and in the actual events that took place when the plaintiff arrived at the citizen's home. The citizen did not need to be transported to the hospital and did not require basic life support. The plaintiff and his partner in *Wilzcak* were familiar with the citizen and had assisted him in getting into bed on prior occasions. Thus, it was foreseeable that they would have to help the patient into bed again

during the call where the plaintiff was injured. The plaintiff's partner also testified that they could have waited for additional personnel to assist them in moving the patient into bed, indicating that the need to move the patient was not emergent.

¶ 40    Here, there is no suggestion that Mr. Ford had prior experience with the patient in this case. Mr. Ford could not have known what condition he would find the patient in when he arrived. Moreover, the patient was transported to the hospital to be evaluated by emergency room staff and was not simply helped into bed. Mr. Ford did not know the cause of the patient's weakness or pain. Therefore, we find the circumstances in this case distinct from those presented in *Wilzcak*.

¶ 41    Accordingly, we find that these facts establish that Mr. Ford was injured as a result of his response to what he reasonably believed to be an emergency. We are therefore left with the definite and firm conviction that the Village's finding to the contrary was clearly erroneous. We find that, under the circumstances of this case, Mr. Ford was entitled to benefits under section 10 of the Act and we affirm the judgment of the circuit court reversing the decision of the Village.

¶ 42                               III. CONCLUSION

¶ 43    For the reasons stated, we affirm the judgment of the circuit court of Cook County, reversing the decision of the Village.

¶ 44    Affirmed.