2015 IL App (2d) 130920
No. 2-13-0920
Opinion filed April 27, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| WILLIAM BREMER, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee and | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 08-MR-437 |
| | ) | |
| THE CITY OF ROCKFORD, | ) | |
| | ) | Honorable |
| Defendant-Appellant and | ) | J. Edward Prochaska, |
| Cross-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren concurred in part and dissented in part in the judgment, with opinion.

## OPINION

¶ 1    Defendant, the City of Rockford, appeals from the entry of summary judgment in favor of

plaintiff, William Bremer, and the denial of Rockford's cross-motion for summary judgment, on

Bremer's claim for health care benefits under the Public Safety Employee Benefits Act (Benefits

Act) (820 ILCS 320/1 *et seq.* (West 2008)).   In another proceeding, Bremer, a firefighter

suffering from a heart condition, obtained an occupational disease disability pension under

section 4-110.1 of the Illinois Pension Code (Pension Code) (see 40 ILCS 5/4-110.1 (West

2008)).   In this case, the trial court ruled that the pension qualified him for benefits under

section 10 of the Benefits Act.   On appeal, Rockford argues that the trial court erred in granting

Bremer summary judgment on his claim under section 10, because (1) his eligibility for the occupational disease disability pension does not mean that he suffered a "catastrophic injury," which is required for health care benefits (see 820 ILCS 320/10(a) (West 2008)), and (2) Bremer's injury did not result from his "response to what is reasonably believed to be an emergency," which is also required (see 820 ILCS 320/10(b) (West 2008)). We hold that an occupational disease disability pension granted under section 4-110.1 of the Pension Code satisfies the "catastrophic injury" element of section 10(a), but that a question of fact regarding section 10(b) precludes summary judgment for Bremer on his claim for health care benefits under the Benefits Act.

¶ 2    Bremer cross-appeals from the trial court's orders denying his claim under the Attorneys Fees in Wage Actions Act (Wage Actions Act) (705 ILCS 225/1 *et seq.* (West 2008)) and dismissing portions of his claim for damages arising out of unpaid health insurance premiums and medical expenses that he incurred while uninsured. We agree with the trial court that, as a matter of law, Bremer is not entitled to recover attorney fees under the Wage Actions Act, because, even if he were to prevail on his claim for postemployment health care benefits under the Benefits Act, those benefits would not qualify as "wages earned and due and owing according to the terms of the employment." 705 ILCS 225/1 (West 2008). We further hold that Bremer's claim for unpaid health insurance premiums and medical expenses is not ripe for adjudication, because there is no longer a judgment requiring Rockford to pay health insurance premiums for Bremer or his wife.

¶ 3    In sum, we affirm the trial court's order denying Bremer's request for attorney fees. We reverse the entry of summary judgment for Bremer on his claim brought under section 10 of the

Benefits Act. We vacate the rulings on Bremer's claim for unpaid health insurance premiums and medical expenses, and we remand the cause for further proceedings on that claim.

¶ 4                                    I. BACKGROUND

¶ 5     Rockford hired Bremer as a firefighter in 1976. On May 12, 2004, Bremer filed an application with the City of Rockford Firefighters' Pension Board (Board), seeking an occupational disease disability pension pursuant to section 4-110.1 of the Pension Code (see 40 ILCS 5/4-110.1 (West 2008)). Bremer presented evidence that his cardiomyopathy rendered him unable to work as a firefighter.

¶ 6     On February 1, 2007, the Board granted Bremer's application for an occupational disease disability pension under section 4-110.1 of the Pension Code. The Board found that Bremer was a firefighter with more than five years of creditable service who was rendered disabled as a result of a disease of the heart, cardiomyopathy, which resulted from service in the fire department. The Board found that Bremer had been exposed to chemicals and toxins while fighting fires and that he had experienced heavy to very heavy exertion during emergency calls when he entered fires, lifted people and equipment, overhauled fire scenes, and responded to ambulance calls. The Board also found that Bremer's disability was permanent. Bremer's pension was effective January 5, 2005.

¶ 7     Pursuant to a city ordinance, Rockford paid health insurance premiums as a benefit for Bremer and his wife, Sally, from January 2005 through February 2008. On February 21, 2008, Rockford informed Bremer that, on March 1, 2008, Rockford would no longer pay the premiums, which were approximately $1,100 per month. Rockford directed Bremer to pay the premiums himself, from his pension checks, if he wished to maintain the benefits.

¶ 8    On March 20, 2008, Bremer applied to Rockford for the payment of health insurance premiums pursuant to the Benefits Act. Bremer supplemented the application with the Board's finding that he was disabled and entitled to an occupational disease disability pension.

¶ 9    Following an informal meeting with Bremer, Rockford denied the application on the basis that Bremer had not suffered a "catastrophic injury" as required by section 10(a) of the Benefits Act (see 820 ILCS 320/10(a) (West 2008)). Rockford determined that, although a line-of-duty pension under section 4-110 of the Pension Code is synonymous with a "catastrophic injury," the occupational disability pension that Bremer received under section 4-110.1 is not.

¶ 10   On June 1, 2008, Bremer filed a two-count complaint for a declaratory judgment and attorney fees in the trial court. Count I sought a declaratory judgment that the meaning of "catastrophic injury," as used in section 10(a) of the Benefits Act, includes "the line-of-duty disability Occupational Diseases under Section 4-110.1 of the Illinois Pension Code." Bremer also sought a declaration that Rockford was obligated to pay future health insurance premiums for him and Sally and reimburse Bremer for any premiums he paid in 2008. Count II sought attorney fees under the Wage Actions Act.

¶ 11   The parties filed cross-motions for summary judgment as to count I. On April 19, 2011, the trial court granted Bremer's motion and denied Rockford's motion, declaring that the occupational disease disability pension that Bremer received under section 4-110.1 of the Pension Code qualified him and Sally for health care benefits under section 10 of the Benefits Act. The trial court ordered Rockford to reinstitute the health care benefits and to reimburse Bremer for the premiums he paid after Rockford's denial of his application.

¶ 12   Count II remained pending until January 23, 2013, when the trial court granted Rockford's motion for summary judgment, ruling that "[the Act's] post-employment health insurance benefits do not qualify as 'wages earned and due and owing according to the terms of employment,' " such that, as a matter of law, Bremer was not entitled to recover attorney fees under the Wage Actions Act.

¶ 13   Meanwhile, on May 25, 2011, the trial court granted Bremer leave to add a count III to the complaint.   Bremer alleged that, during the period in which Rockford declined to pay the insurance premiums, Bremer could not afford to pay for health insurance for him and Sally, and they remained uninsured.   During that period, Bremer and Sally allegedly incurred more than $39,000 in medical expenses, for which Bremer sought reimbursement.   Bremer also sought $38,000 for "the premiums which ought to have been paid but were not," as he and Sally "were deprived of the value of these premiums and [Rockford] was unjustly enriched for failing to comply with its obligations under the law."

¶ 14   In May 2012, Rockford filed a combined motion to dismiss count III pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619, 2-619.1 (West 2008)).   On September 28, 2012, pursuant to section 2-615, the trial court dismissed the claim for $38,000 for unpaid premiums.   See 735 ILCS 5/2-615 (West 2008).   Pursuant to section 2-619, the court also dismissed Bremer's claim for approximately $36,000 in medical expenses relating to a one-car collision involving Sally.   See 735 ILCS 5/2-619 (West 2008).   Those expenses had been paid under Bremer's auto insurance policy, and the trial court determined that Bremer lacked standing to sue under the Rights of Married Persons Act, commonly known as the Family Expense Act.   See 750 ILCS 65/15 (West 2008).   Following a hearing on August 9, 2013, regarding health insurance premiums that Bremer actually paid and

other out-of-pocket medical expenses, the trial court ordered Rockford to pay Bremer $6,381 plus court costs under count III.

¶ 15    Rockford filed a notice of appeal, seeking review of the trial court's grant of summary judgment in favor of Bremer on count I.   Bremer filed a cross-appeal as to the grant of summary judgment on count II and the dismissed portions of his damages claim under count III.[1]

¶ 16                                II. ANALYSIS

¶ 17                              A. The Benefits Act

¶ 18    Rockford contends that the trial court erred in granting Bremer's motion for summary judgment, and denying Rockford's cross-motion, on count I.   Summary judgment is appropriate only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   735 ILCS 5/2-1005(c) (West 2008).   "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts."   *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004).   The use of summary judgment is to be encouraged as an aid in the expeditious disposition of a lawsuit; however, it is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt.   *Springborn v. Village of Sugar Grove*,

---

[1] Bremer also filed a motion in this court to strike portions of Rockford's reply brief or for leave to file a surreply, arguing that Rockford's reply brief raised "new points and authorities" in violation of Illinois Supreme Court Rule 341(j) (eff. Feb. 6, 2013).   We decline to strike any portion of Rockford's reply brief, and we deny the motion to that extent; however, we grant Bremer leave to file a surreply brief, *instanter*.

2013 IL App (2d) 120861, ¶ 24.   We review *de novo* a trial court's grant of summary judgment. *Springborn*, 2013 IL App (2d) 120861, ¶ 24.

¶ 19    "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record."    *Pielet v. Pielet*, 2012 IL 112064, ¶ 28.    However, the mere fact that cross-motions for summary judgment have been filed does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment.    *Pielet*, 2012 IL 112064, ¶ 28.

¶ 20    The parties dispute the interpretation of section 10 of the Benefits Act and sections 4-110 and 4-110.1 of the Pension Code.   The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature.   *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009).   The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning.   *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216 (2008).   When the statutory language is clear and unambiguous, it must be applied as written without resort to extrinsic aids of statutory interpretation.   *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009).   We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature.   *MidAmerica Bank, FSB*, 232 Ill. 2d at 565-66.

¶ 21    The trial court ordered Rockford to pay Bremer's health insurance premiums pursuant to section 10 of the Benefits Act, which provides in relevant part as follows:

"(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of

the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee ***.

* * *

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this Section shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10 (West 2008).

¶ 22                    1. Catastrophic Injury (Section 10(a))

¶ 23                    a. Line-of-Duty Disability (Section 4-110)

¶ 24    The parties dispute whether Bremer's disability is synonymous with a catastrophic injury suffered in the line of duty as required under section 10(a) of the Benefits Act. The Pension Code defines three types of disability: (1) a line-of-duty disability (40 ILCS 5/4-110 (West 2008)), (2) an occupational disease disability (40 ILCS 5/4-110.1 (West 2008)), and (3) a non-line-of-duty disability (40 ILCS 5/4-111 (West 2008)). In this case, the evidence of a catastrophic injury under section 10(a) is confined to the 2007 proceeding in which the Board granted Bremer an occupational disease disability pension.

¶ 25    We are guided by *Krohe v. City of Bloomington*, 204 Ill. 2d 392 (2003), where a firefighter had been adjudicated disabled under section 4-110 of the Pension Code but denied

benefits under the Benefits Act. Our supreme court addressed the meaning of "catastrophic injury" under section 10(a).

¶ 26 After finding the phrase to be ambiguous, the *Krohe* court investigated the statute's legislative history and debates. Noting that "the legislative history and debates could not be clearer" (*Krohe*, 204 Ill. 2d at 398) the *Krohe* court construed "catastrophic injury" as "synonymous with an injury resulting in a line-of-duty disability pension under section 4-110 of the [Pension] Code" (*Krohe*, 204 Ill. 2d at 400). A firefighter is entitled to a line-of-duty disability pension under section 4-110 if he or she, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found *** to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension." 40 ILCS 5/4-110 (West 2008).

¶ 27 Relying on *Krohe*, this court held in *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, that, "because the legislature intended an injured firefighter or police officer to be eligible for benefits under section 10(a) of [the Benefits Act] whenever his or her injuries were sufficient to qualify for a line-of-duty pension, the pension board's determination in this regard establishes as a matter of law that the firefighter or police officer received a catastrophic injury." *Richter*, 2011 IL App (2d) 100114, ¶ 16. More recently, this court held that, where it is undisputed that a firefighter had been awarded a line-of-duty pension, "it is an uncontroverted fact that he was catastrophically injured for purposes of section 10(a) of the Act." *Village of Vernon Hills v. Heelan*, 2014 IL App (2d) 130823, ¶ 20. Thus, it is well settled that, under *Krohe*, the award of a line-of-duty pension under section 4-110 of the Pension Code satisfies the

"catastrophic injury" element of section 10(a) of the Benefits Act. Rockford unequivocally conceded this point in its appellate brief and during oral argument.

¶ 28                    b. Occupational Disease Disability (Section 4-110.1)

¶ 29    The issue then in this case is whether a "catastrophic injury" under section 10(a) of the Benefits Act is also synonymous with a firefighter's occupational disease disability under section 4-110.1 of the Pension Code.   Section 4-110.1 provides, in relevant part, as follows:

> "An active firefighter with 5 or more years of creditable service who is found, pursuant to Section 4-112, unable to perform his or her duties in the fire department by reason of heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, resulting from service as a firefighter, is entitled to an occupational disease disability pension during any period of such disability for which he or she has no right to receive salary."   40 ILCS 5/4-110.1 (West 2008).

¶ 30    Section 4-110.1 defines a firefighter's occupational disease disability as "heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, resulting from service as a firefighter" (40 ILCS 5/4-110.1 (West 2008)), while section 4-110 defines a firefighter's line-of-duty disability as a "sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty" (40 ILCS 5/4-110 (West 2008)).

¶ 31    We agree with the trial court that these provisions are similar in the way they define a firefighter's injury resulting in disability.   Section 4-110 refers broadly to "sickness, accident or injury," while section 4-110.1 is more disease-specific, listing "heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract."   The conditions specified in section 4-110.1 are examples of injuries that are also covered by section 4-110.

¶ 32    A line-of-duty disability pension requires that the applicant's sickness, accident, or injury be "incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty." 40 ILCS 5/4-110 (West 2008). "Act of duty" is specifically defined as "[a]ny act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2008).

¶ 33    Section 4-110.1 applies to "heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, resulting from *service as a firefighter*" or "a disabling cancer, *which develops or manifests itself during a period while the firefighter is in the service of the fire department*." (Emphases added.) 40 ILCS 5/4-110.1 (West 2008). In describing the occupational disease disability pension, the legislature acknowledged that firefighters are subject to exposure to heat, cold, heavy smoke fumes, and carcinogenic, poisonous, toxic, or chemical gasses from fires "and that these conditions exist and arise out of or in the *course of employment*." (Emphasis added.) 40 ILCS 5/4-110.1 (West 2008).

¶ 34    Thus, a line-of-duty pension must result from an act of duty or cumulative acts of duty, which are specifically defined under section 6-110 of the Pension Code, but an occupational disease disability must result from "service as a firefighter," which is not specifically defined by statute. However, neither section 10(a) nor the legislators' comments discussed in *Krohe* mention "acts of duty" as the basis for finding a catastrophic injury; rather, they refer generally to an injury suffered in the line of duty. The legislature provided different requirements for line-of-duty and occupational disease pensions, but the causation requirement under the Benefits

Act is specifically set forth in section 10(b), but not 10(a), such that the differences are not relevant to identifying a catastrophic injury suffered in the line of duty under section 10(a).

¶ 35 The *Krohe* court held that any injury required for a line-of-duty disability pension under section 4-110 of the Pension Code satisfies the "catastrophic injury" element of section 10(a) of the Benefits Act. We agree with the trial court that there is "no meaningful distinction between a line-of-duty disability based on sickness resulting from cumulative acts of duty (section 4-110), and an occupational disease disability based on cardiomyopathy resulting from service as a firefighter (section 4-110.1)." For the purpose of our statutory interpretation in this case, *Krohe* supports our determination that "catastrophic injury" under section 10(a) of the Benefits Act is synonymous with Bremer's cardiomyopathy, the injury for which he was eligible for an occupational disease disability pension under section 4-110.1.

¶ 36 We further note that sections 4-110 and 4-110.1 use an identical method for calculating disability pensions, which also supports our conclusion. Each statute provides that the firefighter shall be entitled to a disability pension equal to the greater of (1) 65% of the salary attached to the rank held by the firefighter in the fire department at the date he or she is removed from the municipality's fire department payroll or (2) the retirement pension that the firefighter would be eligible to receive if he or she retired (but not including any automatic annual increase in that retirement pension). 40 ILCS 5/4-110, 4-110.1 (West 2008). Moreover, each statute provides that the firefighter shall also be entitled to a child's disability benefit of $20 per month for each child who is natural born or legally adopted, under 18 years old, and dependent upon the firefighter for support. Under each statute, the total child's disability benefit payable to the firefighter, when added to the firefighter's disability pension, shall not exceed 75% of the salary

that the firefighter was receiving at the end of his or her employment. 40 ILCS 5/4-110, 4-110.1 (West 2008).

¶ 37    In contrast, a firefighter eligible for a non-line-of-duty disability pension under section 4-111 of the Pension Code receives less. "A firefighter having at least 7 years of creditable service who becomes disabled as a result of any cause other than an act of duty, and who is found, pursuant to Section 4-112, to be physically or mentally permanently disabled so as to render necessary his or her being placed on disability pension, shall be granted a disability pension of 50% of the monthly salary attached to the rank held by the firefighter in the fire service at the date he or she is removed from the municipality's fire department payroll." 40 ILCS 5/4-111 (West 2008).

¶ 38    The legislature's methodology in calculating the three pensions indicates that, unlike a non-line-of-duty disability under section 4-111, an occupational disease disability under section 4-110.1 is to be treated the same as a line-of-duty disability under section 4-110, for purposes of determining the existence of a catastrophic injury under section 10(a) of the Benefits Act.

¶ 39    Rockford argues that "Bremer is ineligible for [Benefits Act] benefits because he did not apply for or receive a line-of-duty pension, *which is required under [the Benefit Act's] clear legislative history*." (Emphasis added.) This is not accurate. Nowhere does the Benefits Act or *Krohe* and its progeny hold that the failure to receive a line-of-duty pension (or even apply for one) precludes someone from receiving benefits under the Act.

¶ 40    Rockford also quarrels with the trial court's comment that Bremer likely would have qualified for a line-of-duty pension under section 4-110 if he had applied for one. Rockford argues that the court abused its discretion by usurping the Board's exclusive authority to decide pension applications. We disagree. The court did not base its determination that Bremer was

eligible for benefits on a finding that he was eligible for a line-of-duty pension. Rather, the court concluded that Bremer's occupational disease disability was synonymous with a catastrophic injury under section 10(a).

¶ 41 We further disagree with Rockford that *Rokosik v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 374 Ill. App. 3d 158 (2007), compels a different result. In *Rokosik*, two Chicago firemen were granted occupational disease disability benefits by the retirement board. When the firemen later died, their widows sought from the board line-of-duty widow annuities under section 6-140 of the Pension Code; instead, they were awarded non-duty-related widow annuities pursuant to section 6-141.1.[2] One premise of the widows' argument was "that the requirements for establishing a duty disability and an occupational disability are the same." *Rokosik*, 374 Ill. App. 3d at 168. The appellate court rejected this premise, concluding that duty disability benefits and occupational disability benefits have different requirements:

> "In contrast to an occupational duty disability benefit under section 6-151.1 of the [Pension] Code, which requires a fireman with a disease other than cancer to establish that the disease resulted from his 'service as a fireman,' a section 6-151 duty disability benefit requires a fireman to establish that he became disabled 'as the result of a specific injury, or of cumulative injuries, or of specific sickness incurred in or resulting from *an act or acts of duty*.' (Emphasis added.) 40 ILCS 5/6-151 (West 2004). Furthermore, whereas an occupational duty disability compensates firemen who are repeatedly exposed to inherently dangerous environments and conditions and is not awarded to firemen who

---

[2] Sections 6-140 and 6-141.1 of the Pension Code apply to municipalities with populations of more than 500,000 and are worded slightly differently from the Pension Code provisions at issue in this case.

have completed less than seven years of service, a duty disability seeks to compensate firemen for injuries or conditions sustained as a result of specific, identifiable act or acts of duty and is not conditioned upon completion of a fixed number of years of service. Finally, the benefit provided for duty disability is not 65% of a fireman's salary but, rather, is 75% of a fireman's salary. 40 ILCS 5/6-151 (West 2004). In short, contrary to [the widows'] contention, the requirements for establishing entitlement to occupational and duty disability benefits are not the same. Accordingly, for the foregoing reasons, we reject [the widows'] argument that section 6-140 of the [Pension] Code, the statutory provision governing duty annuities, entitles widows of occupationally disabled firemen to receive a duty annuity as a matter of law when their husbands' disability permanently prevented them from resuming active service." *Rokosik*, 374 Ill. App. 3d at 170-71.

¶ 42 The *Rokosik* court's discussion of the differences in the causation requirements for line-of-duty and occupational disease disability pensions is accurate. However, those differences are not relevant to a section 10(a) determination regarding catastrophic injury, because, as discussed, section 10(b) sets forth the causation requirement for the Benefits Act. Moreover, the *Rokosik* court emphasized that the benefit for a duty disability is 75% of a firefighter's salary under section 6-151, while the benefit for an occupational disease disability is 65% of his salary under section 6-151.1. However, that discrepancy in benefit does not exist in sections 4-110 and 4-110.1 of the Pension Code, each of which provides for a 65% salary benefit, with a maximum 75% salary benefit.

¶ 43 The dissent focuses on the different causation requirements for line-of-duty and occupational disease disability pensions. While we refuse to respond in kind to the hyperbolic tone of the dissent, we certainly recognize that there are differences in the pension requirements.

The occupational disease disability pension may be available to some firefighters who would be excluded from eligibility for a line-of-duty pension, and vice versa. Our analysis addresses whether the holding in *Krohe* applies to an occupational disease disability pension, *i.e.*, whether the phrase "catastrophic injury" in section 10(a) is "synonymous" with an injury or disease resulting in a pension under section 4-110.1. See *Krohe*, 204 Ill. 2d at 400. For the reasons stated above, we determine that it is.

¶ 44                                2. Causation (Section 10(b))

¶ 45    The trial court was faced with the questions of whether (1) Bremer was catastrophically injured (see 820 ILCS 320/10(a) (West 2008)) and (2) if so, whether the injury occurred as the result of a response "to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act" (see 820 ILCS 320/10(b) (West 2008)). Although we conclude that, as a matter of law, an occupational disease disability under section 4-110.1 of the Pension Code is synonymous with a catastrophic injury under section 10(a) of the Benefits Act, that determination is not dispositive of whether the trial court erred in granting Bremer summary judgment on his Benefits Act claim. A question of fact regarding section 10(b) precludes summary judgment.

¶ 46    "The plain language of subsection (b) provides that public safety employees will receive section 10 benefits when the injury or death occurs as a result of: (1) a response to fresh pursuit; (2) a response to what is reasonably believed to be an emergency; (3) an unlawful act of another; or (4) the investigation of a criminal act." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 57 (citing 820 ILCS 320/10(b) (West 2006)). The four factors set forth different types of scenarios encountered by public safety employees. *Gaffney*, 2012 IL 110012, ¶ 57.

¶ 47    In this case, Bremer argues that he is eligible for benefits under section 10 of the Benefits Act because his condition resulted from the cumulative effect of his "response[s] to what is reasonably believed to be an emergency."   820 ILCS 320/10(b) (West 2008).   In support of their motions for summary judgment, the parties filed a transcript of the Board's hearing on Bremer's occupational disease disability pension application, including the reports and opinions of several physicians and the Board's findings.   To its motion for summary judgment, Rockford also submitted an affidavit from one of its arson investigators regarding the scope of Bremer's employment as it related to his application for benefits under the Benefits Act.   In granting Bremer's motion, the trial court cited the Board's findings that most of Bremer's calls over his 27 years of service were in response to emergencies and that the calls occurred daily and caused significant stress.

¶ 48    However, to be eligible for a section 4-110.1 occupational disease disability pension, Bremer's cardiomyopathy need only have "result[ed] from *service as a firefighter.*"   (Emphasis added.)   40 ILCS 5/4-110.1 (West 2008).   Thus, the Board was charged with determining whether the injury resulted from Bremer's service as a firefighter.   The Board exceeded its obligation when it articulated the specific acts of service that it found to be the cause of Bremer's injury.   Since the Board's decision to grant the pension did not require findings regarding the nature of Bremer's service as a firefighter, the trial court improperly relied on the Board's *dicta* on the matter.   An examination of *Gaffney* and *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, illustrates that a section 10(b) determination is a fact-specific endeavor.

¶ 49    In *Gaffney*, our supreme court defined the legal standard for determining an emergency under section 10(b) of the Benefits Act.   The *Gaffney* court held that "[t]o be entitled to continuing health coverage benefits under section 10(b), the injury must occur in response to

what is reasonably believed to be an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Gaffney*, 2012 IL 110012, ¶ 64.

¶ 50    *Gaffney* involved two consolidated cases.   Firefighter Gaffney was injured during a training exercise involving an actual fire on the third floor of a building.   Gaffney wore full fire gear for the exercise, and his battalion chief instructed him to treat the exercise as an actual emergency.   The fire hose became stuck as the crew was moving it between the second and third floors.   Due to smoke, there was no visibility.   Gaffney followed the hose back down to the second floor and discovered that it was hooked around a loveseat.   In moving this piece of furniture, Gaffney injured his shoulder.   *Gaffney*, 2012 IL 110012, ¶¶ 6-8.

¶ 51    Our supreme court held that Gaffney's training exercise became an emergency when there arose the unforeseen event of the hose becoming stuck.   *Gaffney*, 2012 IL 110012, ¶ 66. This event created imminent danger and required an urgent response, as "the crew was stranded on the stairwell to the third floor of the burning building with no visibility and no water to put out the fire."   *Gaffney*, 2012 IL 110012, ¶ 66.   Moreover, when Gaffney went to free the hose, he "put himself at risk of becoming lost and disoriented in the smoke-filled building."   *Gaffney*, 2012 IL 110012, ¶ 67.   The court noted that Gaffney had no "option of ending his participation in the exercise after it became an emergency."   *Gaffney*, 2012 IL 110012, ¶ 67.

¶ 52    The other firefighter in *Gaffney*, Lemmenes, also was injured during a training exercise. The exercise took place at an abandoned factory, where the firefighters were required to wear full fire gear.   There was no actual fire, but the firefighters' masks were blackened to simulate live fire conditions, and they were told to act as if there was an emergency.   The firefighters were instructed that a fellow firefighter was trapped inside the building, was running out of air, and would die if not found and rescued.   The firefighters were given specific instructions for the

exercise, including a path for running the fire hose into the building. Fire department supervisors testified that the individual acting as the trapped firefighter was never in real danger during the exercise, which was performed under " 'controlled conditions.' " *Gaffney*, 2012 IL 110012, ¶¶ 21-24.

¶ 53 Lemmenes was injured when he attempted to free the trapped firefighter. *Gaffney*, 2012 IL 110012, ¶ 22. Our supreme court held that Lemmenes could not have reasonably believed that he was responding to an "emergency" under section 10(b). The court noted that the exercise was conducted under " 'controlled conditions,' " no one was in imminent danger at any point during the exercise, and "[n]o unexpected or unforeseen developments arose during th[e] drill, unlike the situation in *Gaffney* where the hose line became entangled in an unknown object." *Gaffney*, 2012 IL 110012, ¶ 77.

¶ 54 In *Pederson*, firefighter Pederson and others responded to a call regarding a tanker truck fire on an Illinois toll road and proceeded to the location in full gear, with emergency lights and siren activated. After the fire was extinguished, while Pedersen and other firefighters were cleaning the scene and packing their equipment, the fire engine remained positioned to protect the firefighters, who were still working upon the toll road. The fire engine's emergency lights remained activated as an additional safeguard for the firefighters. Pedersen was returning safety triangles from the tanker truck and was within feet of the fire engine when the siren was inadvertently and unexpectedly activated, causing hearing loss. The appellate court determined that Pedersen's testimony regarding these facts fell within the scope of a response to what was reasonably believed to be an emergency under section 10(b) of the Benefits Act, notwithstanding the municipality's opinion to the contrary. The appellate court concluded that it was reasonable for Pederson to believe that the emergency was ongoing and that the scene remained dangerous.

Accordingly, Pedersen was injured as the result of an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. *Pedersen*, 2014 IL App (1st) 123402, ¶ 58 (citing *Gaffney*, 2012 IL 110012, ¶ 66).

¶ 55 The question of whether an emergency exists is not categorical, but depends on the circumstances of the moment. An event or incident that is not initially an emergency can become an emergency as the circumstances change. *Pedersen*, 2014 IL App (1st) 123402, ¶ 58 (citing *Gaffney*, 2012 IL 110012, ¶ 66). Even in light of the Board's findings about Bremer's service as a firefighter, the materials submitted in support of the cross-motions for summary judgment raise a question of fact concerning whether Bremer's cardiomyopathy was a result of a response to what was reasonably believed to be an emergency under section 10(b). This question of fact precludes the entry of summary judgment on his section 10 claim.[3]

¶ 56                                    B. Wage Actions Act

¶ 57 Bremer cross-appeals from the trial court's grant of summary judgment in favor of Rockford on count II of the complaint, which sought the recovery of attorney fees pursuant to the Wage Actions Act. The Wage Actions Act provides in relevant part as follows:

"Whenever a[n] *** employee brings an action for *wages earned and due and owing according to the terms of the employment*, and establishes by the decision of the court or

---

[3] In *Pedersen*, the Village, as a home-rule unit, was authorized to develop procedures for reviewing claims under the Benefits Act. *Pedersen*, 2014 IL App (1st) 123402, ¶ 37 ("a home rule unit may employ an administrative procedure for assessing claims without acting in a manner inconsistent with the requirements of the [Benefits] Act"). Here, Rockford does not argue that it has such procedures in place or that Bremer must exhaust his administrative remedies before filing his declaratory judgment action in the trial court.

jury that the amount for which he or she has brought the action is justly due and owing, and that a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing, then the court shall allow to the plaintiff a reasonable attorney fee of not less than $10, in addition to the amount found due and owing for wages, to be taxed as costs of the action." (Emphasis added.) 705 ILCS 225/1 (West 2008).

¶ 58 After paying the health insurance premiums for three years, Rockford stopped paying in March 2008. Bremer's claim under the Wage Actions Act represents the premiums that he paid after Rockford refused to do so. Bremer made his demand for reimbursement for the premiums on May 20, 2008. Bremer seeks "the sum of $2,214 in health insurance premiums representing two months of premiums which [Rockford] refused to pay."

¶ 59 The Wage Actions Act applies to actions "for wages earned and due and owing according to the terms of the employment." The trial court concluded that "[u]nder Section 1 of the Act's statutory language, health insurance benefits under the [Wage Actions] Act do not qualify as 'wages earned and due and owing according to the terms of employment' as they are not payments to an employee for services rendered." We agree. Benefits under the Benefits Act are postemployment benefits. As our supreme court has stated:

"According to the relevant legislative history, then, [the Benefits Act] was enacted to protect officers who *already have been forced into retirement* by a line-of-duty injury. It provides a *postemployment benefit*, designed to ensure that the *termination of an officer's employment*, whether by death or by injury, does not likewise precipitate the termination of his or her family's employer-sponsored health insurance coverage. This

is how the legislative sponsors understood [the Benefits Act], and it is how we understand it as well.

Notably, this reading of [the Benefits Act] makes perfect sense from a public policy standpoint. Again, according to [the Benefits Act's] legislative sponsors, one of [the Benefits Act's] primary purposes is to continue the provision of employer-sponsored health insurance coverage for officers and the families of officers who, due to a line-of-duty injury, *have been forced to take a line-of-duty disability pension*. That is, [the Benefits Act] ensures a continuation of health insurance coverage *following the termination of the officer's employment*. The reason this makes sense is that, unless and until the officer's employment is terminated by the awarding of a line-of-duty disability pension, he remains an employee of the municipality in question and therefore fully eligible for all employee benefits, including his employer-sponsored health insurance coverage. In other words, prior to the awarding of a line-of-duty disability pension, an injured officer's employer-sponsored health insurance coverage would 'continue' whether or not [the Benefits Act] was on the books." *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶¶ 16-17. (Emphases in original and added.)

¶ 60    Bremer relies on several dictionaries to define "wage"; however, each definition refers to "hired person," "employee," or "employer." See Black's Law Dictionary 1416 (5th ed. 1979); Webster's Third New International Dictionary 2568 (1986). None of those definitions applies to a person who is no longer employed, which is a *sine qua non* of receiving benefits under section 10. In no case can the section 10 benefits, which can be granted only after the termination of a claimant's employment, be considered "wages" under the Wage Actions Act. We hold, as a matter of law, that section 10 benefits are not wages under the Wage Actions Act.

Although we reverse the trial court's judgment and remand as to whether benefits should be ordered under the Benefits Act, Bremer could not prevail on his Wage Actions Act claim even if he ultimately receives benefits. Therefore, we affirm the trial court's grant of summary judgment for Rockford on count II of the complaint.

¶ 61                    C. Reimbursement of Medical Expenses

¶ 62    Bremer next contends that the trial court erred in dismissing in part his claim arising during a period in which Bremer and his wife were uninsured. Bremer seeks (1) the value of the health insurance premiums that went unpaid during this period and (2) the medical expenses that Bremer's automobile insurance company paid after Sally was injured in a one-car accident. Since we have reversed and remanded for further proceedings on count I, there is no judgment requiring Rockford to pay any health insurance premiums for Bremer or his wife. Thus, any claim for damages that is based on Rockford's failure to pay such premiums is not ripe for adjudication, and we vacate the trial court's rulings on count III of the complaint.

¶ 63                           III. CONCLUSION

¶ 64    For these reasons, the judgment of the circuit court of Winnebago County is affirmed in part, reversed in part, and vacated in part, and the cause is remanded for further proceedings.

¶ 65    Affirmed in part, reversed in part, and vacated in part; cause remanded.

¶ 66    JUSTICE McLAREN, concurring in part and dissenting in part.

¶ 67    I concur with the majority holding regarding the Wage Action Act.

¶ 68    However, I dissent from the majority's Benefits Act analysis and its holding that "an occupational disease disability pension granted under section 4-110.1 of the Pension Code satisfies the 'catastrophic injury' element of section 10(a)" of the Act. *Supra* ¶ 1. The majority's utter confusion on this issue is encapsulated in paragraph 34, which I repeat here:

"Thus, a line-of-duty pension must result from an act of duty or cumulative acts of duty, which are specifically defined under section 6-110 of the Pension Code, but an occupational disease disability must result from 'service as a firefighter,' which is not specifically defined by statute. *However, neither section 10(a) nor the legislators' comments discussed in Krohe mention 'acts of duty' as the basis for finding a catastrophic injury; rather, they refer generally to an injury suffered in the line of duty.* The legislature provided different requirements for line-of-duty and occupational disease pensions, but the causation requirement under the Benefits Act is specifically set forth in section 10(b) such that the differences are not relevant to identifying a catastrophic injury suffered in the line of duty under section 10(a)." (Emphasis added.) *Supra* ¶ 34.

¶ 69 There is a very good reason why "neither section 10(a) nor the legislators' comments discussed in *Krohe* mention 'acts of duty' as the basis for finding a catastrophic injury." That is, "acts of duty" is a requirement *only for obtaining a line-of-duty disability pension from the pension board*, not for obtaining insurance benefits under the Benefits Act. The plaintiff in *Krohe* had already obtained a line-of-duty pension; he had already proven to the pension board that he had been injured in the line of duty. The City of Bloomington did not contest the finding of the pension board as establishing the plaintiff's injury; it contested the trial court's interpretation of "catastrophic injury" in section 10(a) as meaning "any injury resulting in a line-of-duty disability under section 4-110" of the Pension Code. *Krohe v. City of Bloomington*, 329 Ill. App. 3d 1133, 1134 (2002). Our supreme court then held that the phrase "catastrophic injury" is "synonymous with an injury resulting in a line-of-duty disability under section 4-110 of the Code." *Krohe*, 204 Ill. 2d at 400. *Krohe* involved an analysis of section 10 of the Benefits Act, which involves its own set of requirements that must be proved before

insurance benefits may be ordered. The majority confuses the requirements that must be fulfilled in order to obtain a pension under the Pension Code with the requirements that must be fulfilled under section 10 of the Benefits Act. They are not the same. An application for a pension and an application for Benefits Act benefits involve different proceedings before different tribunals considering (potentially) different evidence presented by different parties regarding different causes of action.

¶ 70 The majority relies on *Krohe* and its progeny, including *Richter*, 2011 IL App (2d) 100114, and *Village of Vernon Hills*, 2014 IL App (2d) 130823, to blithely assert that "it is well settled that *** the award of a line-of-duty pension under section 4-110 of the Pension Code satisfies the 'catastrophic injury' element of section 10(a) of the Benefits Act." *Supra* ¶ 27. However, I must point out that our supreme court has allowed the petition for leave to appeal in the most recent case in that line, *Village of Vernon Hills*. See *Village of Vernon Hills v. Heelan*, No. 118170 (Nov. 26, 2014). In *Village of Vernon Hills*, I filed a dissent in which I noted that a pension board's grant of a line-of-duty disability pension is not irrefutable proof of a catastrophic injury under section 10(a) in a declaratory judgment proceeding in a trial court:

> "A litigant in a trial court is entitled to have the merits of his case decided by the trial court. Due process is not served when findings of fact and conclusions of law of a different tribunal, with no subject matter jurisdiction over the issue raised, in a different case in which the litigant was not a party and in which the litigant had no right to intervene, are binding on the trial court such that the litigant cannot contest the cause of action, demand strict proof thereof, obtain discovery, present evidence, have the trial court determine the credibility of the witnesses and the weight to be accorded to their

testimony, and generally defend against judgment being entered against it." *Village of Vernon Hills*, 2014 IL App (2d) 130823, ¶ 49 (McLaren, J., dissenting). Perhaps the issue is not as well settled as the majority asserts.

¶ 71    Even assuming, *arguendo*, that the granting of a line-of-duty pension by a pension board is irrefutable proof sufficient to satisfy the requirements of section 10(a) of the Benefits Act (despite the fact that a municipality has no right to participate in the proceedings before the pension board), I would still disagree with the majority's expansion of *Krohe* to include the granting of an occupational disease disability pension as satisfaction of section 10(a).  The legislature has provided different requirements for the two types of pensions.  The line-of-duty pension requires that the applicant's sickness, accident, or injury be "incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty."  40 ILCS 5/4-110 (West 2008).  "Act of duty" is specifically defined as "[a]ny act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person."  40 ILCS 5/4-110 (West 2008).  However, in describing the occupational disease disability pension, the legislature acknowledged that firefighters are subject to exposure to heat, cold, heavy smoke fumes, and carcinogenic, poisonous, toxic, or chemical gasses from fires "and that these conditions exist and arise out of or in the *course of employment*."  (Emphasis added.)  40 ILCS 5/4-110.1 (West 2008).  The legislature did not require that an illness sufficient for an award of an occupational disease disability pension arise from an act or acts of duty; instead, a firefighter need prove only "heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, resulting from *service as a firefighter*" or "a disabling cancer, *which develops or manifests itself during a period while the*

*firefighter is in the service of the fire department*." (Emphases added.) *Id.* Inexplicably, the majority finds the fact that sections 4-110 and 4-110.1 use the same method to calculate the respective pensions more important than the fact that sections 4-110 and 4-110.1 have different requirements for granting the pensions. See *supra* ¶ 36.

¶ 72    When the legislature uses certain language in one section of a statute and different language in another part, we may assume that the legislature intended different meanings. *People v. Fredericks*, 2014 IL App (1st) 122122, ¶ 23. Here, different meanings are manifest. A firefighter's actions in his "service as a firefighter" or in the "service of the fire department" are much more extensive than his specific acts of duty that have for their direct purpose the saving of the life or property of another person. Firefighters may be exposed to heat, cold, or harmful gasses after a fire is already extinguished, or may be exposed to diesel fumes merely by being present for long periods in the firehouse. We also see that the legislature intended to differentiate between occupational disease pensions and line-of-duty pensions in the fact that the occupational disease pension is available only to firefighters with five or more years of service, while the line-of-duty pension is available to any firefighter who is sickened or injured by the performance of an act or acts of duty. See 40 ILCS 5/4-110, 110.1 (West 2008). The occupational disease pension is applicable to less intense, but nevertheless inherently harmful, exposures that occur over the career of a firefighter, as opposed to acute exposures in the course of saving lives or property from fire. See *Rokosik*, 374 Ill. App. 3d at 170-71. In *Rokosik*, one premise of the appellants' argument was "that the requirements for establishing a duty disability and an occupational disability are the same." *Id.* at 168. The appellate court rejected this premise. *Id.* at 169. The majority here finds the *Rokosik* court's rejection of the same

argument now raised in this case to be irrelevant for the same misbegotten reason I described above (s*upra* ¶ 69).

¶ 73    The majority agrees with the trial court "that there is 'no meaningful distinction between a line-of-duty disability based on sickness resulting from cumulative acts of duty (section 4-110), and an occupational disease disability based on cardiomyopathy resulting from service as a firefighter (section 4-110.1).' "    *Supra* ¶ 35.    The majority even finds that the "conditions specified in section 4-110.1 [heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract] are examples of injuries that are also covered by section 4-110."    *Supra* ¶ 31. What, then, is the purpose of having separate line-of-duty and occupational disease disability pensions that both apply to sickness?    Not only are we to assume that the use of different language in different parts of a statute is evidence that the legislature intended different meanings (see *supra* ¶ 72), "[e]ach word, clause, and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous."    *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007).    Under the majority analysis, section 4-110.1 is utterly superfluous; worse still, its restrictive application to active firefighters with five or more years of creditable service is not only superfluous, it is nonsensical.

¶ 74    Interestingly, the majority is inconsistent in the authority that it accords to different parts of a pension board's findings.    The majority finds that the granting of a pension is, in the words of *Village of Vernon Hills*, " 'an uncontroverted fact that [the claimant] was catastrophically injured for purposes of section 10(a) of the Act.'    *Village of Vernon Hills v. Heelan*, 2014 IL App (2d) 130823, ¶ 20."    *Supra* ¶ 27.    Thus, according to the majority, the Board's findings relative to its conclusion that a pension should be granted are, in fact, binding on the trial court.    However, the Board's findings in this case "that most of Bremer's calls over his 27 years of service were in

response to emergencies and that the calls occurred daily and caused significant stress" (*supra* ¶ 47) are considered by the majority to be *dicta* such that the trial court "improperly relied" on them. *Supra* ¶ 48. The majority calls these findings *dicta* because "the Board was charged with determining whether the injury resulted from Bremer's service as a firefighter [under section 4-110.1]" and the Board "exceeded its obligation when it articulated the specific acts of service that it found to be the cause of Bremer's injury." *Supra* ¶ 48. However, the Board was also charged with determining whether Bremer was unable to perform his duties in the fire department because of a disease "resulting from service as a firefighter" (section 4-110.1), not with whether he suffered "a catastrophic injury *** in the line of duty" (section 10(a)).

¶ 75    I agree that, in determining whether to grant a pension, the Board is charged with making findings different from those necessary for an award of benefits under the Benefits Act. As I have stated, an application for a pension and an application for Benefits Act benefits involve different proceedings before different tribunals considering (potentially) different evidence presented by different parties regarding different causes of action. None of the Board's findings regarding the granting of a pension should be relevant to, let alone binding on, the trial court in an action for Benefits Act benefits. The majority's attempt to distinguish between "irrefutable" findings and findings that are mere *dicta* has no rational basis.

¶ 76    The actual question before the trial court in this case, pursuant to section 10(a) of the Benefits Act, was whether Bremer was catastrophically injured. Rockford's motion for summary judgment contained a stipulated statement of facts and stipulated exhibits that included, among other things, transcripts of Bremer's hearing before the Board and the Board's written decision. However, missing from the stipulated evidence were all the exhibits considered by the Board, including the medical reports submitted by Bremer and the Board. In the absence of any

medical evidence, there was no genuine issue of material fact as to whether Bremer suffered a catastrophic injury. Due to the lack of medical evidence, Rockford was entitled to judgment as a matter of law. Instead, the trial court based its judgment on the Board's grant of the occupational disease pension, the court's own unique interpretation and extension of *Krohe*, and the irrelevant issues of which pensions the Pension Board awarded or could have awarded, had such pensions actually been requested. It was the duty of the trial court to evaluate the actual evidence before it to determine whether Bremer was catastrophically injured, not to determine whether Bremer could have been awarded a line-of-duty pension if he had applied for one. The determination of whether Bremer was catastrophically injured should have been based on evidence presented to the court, not on the Board's findings, conclusions, decision, and non-decision regarding that evidence. Otherwise, the trial court's role is akin to administrative review of the Board as opposed to the finder of fact in a declaratory judgment case. Neither the trial court nor the majority here seem to remember that an application for a pension and an application for Benefits Act benefits involve different proceedings before different tribunals considering (potentially) different evidence presented by different parties regarding different causes of action.[4]

¶ 77 The majority creates anomalous comparisons, muddles and confuses statutory requirements, and disregards the maxims of statutory construction in order to expand an already-flawed interpretation of *Krohe*. Therefore, I must dissent.

---

[4] Rockford was not a party before the pension board and had no right to be a party. A municipality currently does not have a right to intervene in such a case, although a pension board has the discretion to permit such an intervention. See *Williams v. Board of Trustees of Morton Grove Firefighters' Pension Fund*, 398 Ill. App. 3d 680, 688-89 (2010).